UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

────────────────────────────

CHRISTOPHER D. HUNTER,

                Petitioner,

     -vs-

PAUL CHAPPIUS, JR.,

                Respondent.

**No. 15-CV-6423(MAT)**
**DECISION AND ORDER**

────────────────────────────

## I.  Introduction

*Pro se* petitioner Christopher D. Hunter ("petitioner" or "Hunter") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is being unconstitutionally detained in respondent Paul Chappius, Jr.'s ("respondent") custody.  Petitioner is incarcerated pursuant to a judgment entered against him on December 17, 2007, in Monroe County Court of New York State ("Monroe County Court" or the "trial court"), following a jury verdict convicting him of murder in the second degree. Petitioner was sentenced to an indeterminate prison term of 25 years to life.

Petitioner asserts that the following claims in his petition: (1) the prosecutor's remarks in summation regarding mercy deprived him of a fair trial; (2) the trial court erred when it told the jury that mercy was an element of the defense of extreme emotional disturbance; (3) petitioner was deprived of the right to be present at all material stages of his trial; (4) trial counsel was ineffective for not objecting to the prosecutor's summation remarks

and for failing to provide notice of a psychiatric defense; and (5) appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to call an expert to support petitioner's extreme emotional disturbance defense. For the reasons discussed below, the Court finds that petitioner has not shown he is entitled to federal habeas relief.

## II. Factual Background and Procedural History

### A. The Underlying Crime

Petitioner met Melissa Hammond in 2000; they began a romantic relationship and ultimately married in 2005 and had three children. Between 2001 and 2006, petitioner was twice convicted of driving while intoxicated ("DWI") and once convicted of aggravated unlicensed driving. Petitioner served nine months in jail for his second DWI offense, and was released on September 12, 2006. While in jail, petitioner came to believe that Ms. Hammond was seeing other men. He sent her several letters in which he discussed his jealousy, and these letters were admitted into evidence at trial. Sometime between petitioner's release from prison and October 5, 2006, Ms. Hammond and her children left the marital home and moved in with Lisa Kildorf, a coworker of Ms. Hammond's at a company called TenCate.

On October 5, 2006, petitioner came to Ms. Hammond's workplace. Ms. Hammond was with Kimberly Whisonant, a male coworker, when she spotted petitioner. Ms. Hammond fled, while

Mr. Whisonant ordered petitioner to leave the premises. Petitioner and Mr. Whisonant had a verbal confrontation, during which petitioner accused Mr. Whisonant of engaging in sexual relations with Ms. Hammond. The two men exited the building and walked to petitioner's car, where they had a fight. Petitioner tried to reach inside his trunk and Mr. Whisonant picked him up and threw him to the ground. Petitioner then drove away, and Mr. Whisonant called the police. Ms. Hammond subsequently obtained an order of protection against petitioner.

Petitioner testified at trial that he was drinking heavily during this time period and that, on October 16, 2006, he tried and failed to end his own life. Petitioner moved in with his mother and found a job, but was laid off on November 16, 2006.

On November 17, 2006, petitioner wrote a letter to his mother in which he stated, among other things: "I feel like I have no choice but to take her life"; "I swear I thought me and her was going to be together forever"; "I can't live with the fact of another man with my wife. So I did what I had to do"; "I know you'll never forgive me for what I'm gonna do, but I couldn't live like this"; and "so just letting you thank you [sic] for trying, but my life is over and so is hers. Till death do us part." Petitioner testified at trial that he was drunk when he authored this letter.

At roughly 4:00 p.m. on November 18, 2006, Robert Moore, Jr. was driving past petitioner's mother's house when he saw a man and a woman, whom he did not recognize, in a yard. Mr. Moore saw the man, whom he would later identify as petitioner, throw the woman to the ground and stab her in the torso. The woman screamed and Mr. Moore yelled repeatedly for petitioner to stop. Mr. Moore did not have a charged cell phone, so he called police from a pay phone. Mr. Moore saw petitioner stab the woman in her body and neck, ultimately leaving the knife in her neck, where it made a pulsating motion and eventually stopped moving. Petitioner then removed the knife from the woman's neck, leaned close to her, and said something to her that Mr. Moore could not hear.

Rochester Police Department ("RPD") Sergeant Gustavo Venosa reported to the scene of the stabbing. At the scene, Sergeant Venosa saw petitioner, who had smudged blood on his shirt and blood dripping from his right hand. Petitioner did not flee, but instead held his hands up and allowed Sergeant Venosa to secure them. Sergeant Venosa asked petitioner if his hand was okay and petitioner responded "that was my wife," at which point Sergeant Venosa saw Ms. Hammond's body lying approximately 50 feet away. Sergeant Venosa called an ambulance. Emergency medical personnel arrived and cut away Ms. Hammond's clothing, revealing multiple puncture wounds to her neck and torso. Sergeant Venosa found a large knife lying five or six feet from Ms. Hammond's body.

At trial, petitioner testified that he had awoken at 7:00 a.m. on November 18, 2006, still drunk from the previous evening. He further claimed that he had been drunk and eaten no food for three days. According to petitioner, he was using a knife to repair a window in his car when Ms. Hammond arrived at his mother's house. Petitioner claimed that, as she was leaving, he asked Ms. Hammond who she was staying with and she told him that she was staying with another man. At that point, petitioner testified, he "lost it," "went into a rage," "flipped out," "blanked out," and "snapped." He stated that he did not recall stabbing Ms. Hammond, but did recall her asking him "why did you do this to me?" He also recalled having thrown the knife into the street.

Sergeant Venosa took petitioner to the hospital to obtain stitches for his hand. Sergeant Venosa testified that he did not believe that petitioner was intoxicated because he did not smell of alcohol, walk off balance, or slur his speech. At the hospital, RPD Investigator Gary Galetta joined Sergeant Venosa and petitioner. Investigator Galetta also testified that he did not notice any signs that petitioner was intoxicated. Unprompted, petitioner told Investigator Galetta that he was "looking at 25" and that he had "cried . . . a river every day" regarding his marital problems.

After the hospital, Sergeant Venosa drove petitioner to the public safety building. While in the car, petitioner asked

Sergeant Venosa if he was "the only one that has ever done anything this stupid before?"  Sergeant Venosa did not respond to this unprompted remark.

At the public safety building, petitioner waived his *Miranda* rights and agreed to speak with the police.  Investigator Galetta interviewed petitioner for 45 minutes, after which petitioner agreed to provide a written statement.  Petitioner reviewed and signed the written statement, which he told the officers was truthful and accurate.  The statement, which was read into the record at trial, indicated that Ms. Hammond had come to drop off their children, that petitioner had asked if they could get together, to which Ms. Hammond had replied "we'll see," and that petitioner "snapped" because he "just couldn't let her go."  The statement further indicated that everything had gone blank for a moment, then Ms. Hammond was on the ground asking petitioner why he had done what he did, whereupon petitioner laid down on top of her and prayed for her.  Petitioner's statement also said that petitioner had seen blood and cuts and knew that he had plunged a knife into Ms. Hammond.

While petitioner was at the hospital and public safety building, RPD Officer Tomesha Angelo investigated the scene of the stabbing and spoke to petitioner's mother.  Petitioner's mother gave Officer Angelo the letter petitioner had written the previous night and showed Officer Angelo petitioner's room.  Officer Angelo

testified at trial that she did not recall seeing any signs of drinking alcohol in petitioner's room or elsewhere in his mother's home.

Deputy Medical Examiner Dr. Scott LaPoint performed an autopsy on Ms. Hammond. Dr. LaPoint testified at trial that Ms. Hammond had 59 stab wounds on her body, as well as some incise wounds (wounds that are wider than they are deep). All the wounds were consistent with the knife recovered from the scene, which Ms. Hammond's brother-in-law, Calvin Miller, Jr., identified at trial as a filet knife belonging to petitioner. Dr. LaPoint further testified that Ms. Hammond had sustained injuries to her heart, both lungs, her liver, one kidney, her stomach, her colon, her esophagus, and her genitals. One cut had severed her left ear. Ms. Hammond's death was caused by the internal and external bleeding caused by the stab wounds, any number of which could have individually caused her death.

**B.    Pre-trial Proceedings**

A Monroe County Grand Jury charged petitioner with second-degree intentional murder. Prior to petitioner's trial, the prosecution sought a ruling, pursuant to *People v. Sandoval*, 34 N.Y. 2d 371 (1974), and *People v. Molineux*, 168 N.Y. 264 (1901), permitting the use at trial evidence of petitioner's five prior misdemeanor and felony convictions and six letters that he had written to his wife. Petitioner's trial counsel, Michael Doran,

Esq. ("trial counsel") agreed on the record to a proceeding whereby the trial court would render a decision on the parties' written submissions, rather than holding a hearing.  Prior to opening statements, the trial court called the prosecutor and defense counsel to the bench to apprise them of its *Sandoval* and *Molineux* rulings; petitioner was not present at this bench conference.  The trial court thereafter, in petitioner's presence, announced the substance of its rulings in open court.

### C.    Trial, Verdict, and Sentencing

Petitioner's jury trial commenced on October 23, 2007.  On October 30, 2007, the jury found petitioner guilty of second-degree murder.  On December 17, 2007, the trial court sentenced petitioner to an indeterminate prison term of 25 years to life.

### D.    Post-conviction Motion to Vacate

Prior to perfecting his direct appeal, petitioner moved *pro se* to vacate the judgment on the ground that his trial counsel provided ineffective assistance.  In particular, petitioner argued that trial counsel was ineffective for having failed to file a notice of intent to present a psychiatric defense pursuant to New York Criminal Procedure Law § 250.10.  The Monroe County Court denied the motion, holding that petitioner had failed to demonstrate the absence of a strategic reason for counsel's failure to file a § 250.10 notice, and explaining that psychiatric testimony is not required to prove the defense of extreme emotional

disturbance.  There is no indication in the record that petitioner sought leave to appeal this decision.

**E.    Direct Appeal**

Petitioner appealed his conviction to the Appellate Division, Fourth Department (the "Appellate Division"), arguing that (1) on summation, the prosecutor improperly asked the jury to show petitioner no more mercy than he had shown his wife, (2) the trial court erred when, in overruling defense counsel's objection to that remark, it stated that mercy was an element of the defense of extreme emotional disturbance, and (3) petitioner was deprived of his statutory right to be present at a hearing on the prosecution's pre-trial *Sandoval* and *Molineux* motions.  Petitioner also filed a *pro se* supplemental brief in which he argued that (1) the prosecutor's summation remarks deprived him of a fair trial, due process, and the right of confrontation, (2) trial counsel was ineffective for having failed to object to the prosecutor's summation remarks, and (3) his constitutional rights were impaired by the lack of a hearing on the prosecution's pre-trial motions.

On March 28, 2014, the Appellate Division unanimously affirmed petitioner's conviction.  *See People v. Hunter*, 115 A.D.3d 1330 (4th Dep't 2014).  The Appellate Division found that the prosecutor's summation remarks concerning mercy were a fair response to trial counsel's summation and that, in any event, they were not so egregious as to deprive petitioner of a fair trial.

The Appellate Division further found that, although the trial court had erroneously stated that mercy was an element of the defense of extreme emotional disturbance, it subsequently corrected that statement in its instructions to the jury, and properly stated the statutory elements of the defense.

With respect to petitioner's claim that he had been denied the right to be present during a material stage of trial, the Appellate Division explained that defense counsel had agreed, on the record, that the trial court would decide the admissibility issues on written submission. The Appellate Division concluded that petitioner had the opportunity to contribute to defense counsel's written submission and that his physical presence was not required at the bench conference where the trial court announced its rulings. The Appellate Division expressly stated that it had review petitioner's *pro se* contentions at that they lacked merit.

Petitioner sought leave to appeal to the New York Court of Appeals (the "Court of Appeals") with respect to all of the issues raised on direct appeal. The Court of Appeals denied petitioner's request on July 7, 2014.

**F.    The Instant Petition**

Petitioner commenced the instant action on July 20, 2015. In his petition, he contends that (1) the prosecutor's remarks in summation regarding mercy deprived him of a fair trial; (2) the trial court erred when it told the jury that mercy was an element

of the defense of extreme emotional disturbance and thereby deprived him of a fair trial; (3) he was deprived of the right to be present at all material stages of his trial; (4) trial counsel was ineffective for not objecting to the prosecutor's summation remarks and for failing to provide notice of a psychiatric defense; and (5) appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to call an expert to support petitioner's extreme emotional disturbance defense.

In his response to the petition, respondent contended that certain of petitioner's claims were unexhausted. Petitioner subsequently requested that the matter be stayed to permit him an opportunity to return to state court and fully exhaust his claims. The Court granted petitioner's request on September 19, 2016.

### G.   State Court Collateral Proceedings

On November 10, 2016, while this matter was stayed, petitioner filed a motion for a writ of error coram nobis in the Appellate Division, arguing that appellate counsel was ineffective for having failed to argue that trial counsel was ineffective for having failed to file notice pursuant to § 250.10. In connection with his coram nobis motion, petitioner submitted a letter from his appellate counsel, William G. Pixley, Esq. ("appellate counsel") explaining that he did not make this argument on direct appeal because the "real question" was whether trial counsel failed to explore the possibility of retaining a psychiatric expert due to

budgetary concerns, and the evidence needed to establish this claim was not in the record.

The Appellate Division summarily denied petitioner's coram nobis motion on December 23, 2016. Petitioner sought leave to appeal to the Court of Appeals, which denied his application on April 18, 2017. Petitioner subsequently filed an amended petition in this Court, raising the same claims set forth in his initial petition.

## III. Discussion

### A. Standard of Review

"Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (internal quotation omitted). "The question is 'not whether the state court was incorrect or erroneous in rejecting petitioner's claim, but whether it was objectively unreasonable in doing so.'" *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 367 (E.D.N.Y. 2013) (quoting *Ryan v. Miller*, 303 F.3d 231, 245 (2d Cir. 2002)). "The petition may be granted only if 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the

Supreme] Court's precedents.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

**B.    The Prosecutor's Summation Remarks Regarding Mercy**

Petitioner contends that the prosecutor's summation remarks regarding mercy deprived him of a fair trial.  In particular, petitioner takes issue with the prosecutor's statement that the jury should show petitioner no more mercy than petitioner showed Ms. Hammond.  Petitioner contends that this statement was "patently improper."

"The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  "The question . . . is whether the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair."  *Id.* (internal quotation omitted).  "[S]tatements during summation are permissible if they constitute a fair comment on the evidence at trial and reasonable inference therefrom, or a fair response to remarks made by the defense counsel during summation."  *Osorio v. Conway*, 496 F. Supp. 2d 285, 301 (S.D.N.Y. 2007) (internal quotation omitted).

Here, the Appellate Division found, and the Court agrees, that the prosecutor's remarks about mercy were "a fair response to

defense counsel's summation." *Hunter*, 115 A.D.3d at 1331. In summation, defense counsel had argued extensively that petitioner's actions were the result of his difficult circumstances and specifically asked the jury "[a]re we tough and cold, or can we see in fellow human beings those frailties that sometimes we need to that allow a person to become so frazzled, so frenzied, that we could do this to someone else?" Defense counsel further described petitioner as "a man with all the weight of the world on his shoulder[s]" and "a man beyond human endurance." While defense counsel did not specifically use the word "mercy," his summation remarks plainly encouraged the jury to feel sympathy for petitioner and his circumstances, rather than acting "tough" or "cold." The prosecutor's remarks were directly responsive to defense counsel's encouragement to the jury to act out of compassion and understanding. Accordingly, the Court cannot find that the Appellate Division's rejection of petitioner's argument was contrary to, or an unreasonable application of, established federal law.

### C. The Trial Court's Erroneous Statement

Trial counsel objected to the prosecutor's summation remarks about mercy. In overruling that objection, the trial court erroneously stated that "mercy" was an element of an extreme emotional disturbance defense, but subsequently corrected the error while instructing the jury. Petitioner argues that the trial

court's incorrect statement resulted in an unfair trial, because it emboldened the prosecution to improperly argue that the jury should not "cut [petitioner] a break" when he had not done so for Ms. Hammond.

Petitioner's argument is without merit. With respect to the trial court's misstatement, an isolated error later corrected by the trial court does not constitute a due process violation. *See, e.g., Baker v. Greene*, 2010 WL 3504783, at *5 (W.D.N.Y. Sept. 2, 2010) (habeas relief not warranted where trial court said "this defendant" instead of "the shooter," but immediately corrected itself); *Freeman v. United States*, 2005 WL 1498289, at *6 (E.D.N.Y. June 17, 2005) (trial court's misstatement that petitioner had pleaded "not innocent," which was subsequently corrected, did not warrant habeas relief). "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and the jurors here were properly instructed on the elements of a defense of extreme emotional disturbance. Petitioner has not demonstrated that the trial court's isolated misstatement entitles him to habeas relief.

Petitioner's argument that the trial court's misstatement emboldened the prosecutor fairs no better. As discussed above, defense counsel's summation remarks had introduced into the proceedings the notion that the jury should take pity on petitioner. The prosecutor's statement that the jury should not

cut petitioner a break, like his comments about mercy, were directly responsive to defense counsel's summation.

### D.    **Presence at Material Stages of Trial**

Petitioner contends that his constitutional rights were violated because he was not present at the bench conference where the trial court announced its rulings on the prosecution's applications under *Sandoval* and *Molineux*. Petitioner argues that he had a statutory right to be present and that he had personal knowledge of relevant factual matters.

Petitioner's argument is without merit. First, to the extent that it is based on New York statutory requirements, it is not cognizable on federal habeas review. *See, e.g., Saracina v. Artus*, 452 F. App'x 44, 46 (2d Cir. 2011) (claims based on state law are not cognizable on federal habeas review).

Second, petitioner has not shown that his constitutional rights were violated. A criminal defendant has "a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (internal quotation omitted). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Id*. As such, a due

process violation occurs only if the defendant's absence affected the fairness of the proceedings.

Here, the only relevant stage of the proceedings at which petitioner was not present was the bench conference where the trial court announced its rulings. Petitioner has offered no credible argument for how his absence at this bench conference impacted the fairness of his trial. As the Appellate Division explained on direct appeal, petitioner had ample opportunity to contribute to defense counsel's written submissions on this point, and his "physical presence was not required at that bench conference inasmuch as the court was simply placing on the record the [rulings] it had already made with respect to the People's *Sandoval* and *Molineux* applications, and defendant could not reasonably have contributed his views even if he had been present." *Hunter*, 115 A.D.3d at 1331 (internal quotation omitted). The Court agrees, and therefore finds that the Appellate Division's decision was neither contrary to, nor an unreasonable application of, existing federal law.

To the extent the petition may be read as contending that the trial court was constitutionally required to hold a hearing on the prosecution's *Sandoval* and *Molineux* requests, there is no merit to such a contention. The right to such a hearing "derives from state law, not [the] federal constitution." *Pena v. Fischer*, 2003 WL 1990331, at *10 (S.D.N.Y. Apr. 30, 2003).

### E. Ineffective Assistance of Counsel

"The Sixth Amendment requires effective assistance of counsel at [the] critical stages of a criminal proceeding." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). "Pursuant to the well-known two-part test of *Strickland v. Washington* . . . a habeas petitioner alleging ineffective assistance of counsel 'must demonstrate (1) that his counsel's performance fell below what could be expected of a reasonably competent practitioner; and (2) that he was prejudiced by that substandard performance.'" *Woodard v. Chappius*, 631 F. App'x 65, 66 (2d Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 241, (2009)). Moreover, where, as here, the state court has rejected a claim of ineffective assistance of counsel, a "doubly deferential [standard of] judicial review" applies on federal habeas review. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Accordingly, to prevail on his claim of ineffective assistance of counsel, petitioner must show that the state court's application of *Strickland* was objectively unreasonable.

### 1. Procedurally Barred Claim

Petitioner has made the following ineffective assistance of counsel claims: (1) trial counsel was ineffective for not objecting to the prosecutor's summation remarks and for failing to provide notice of a psychiatric defense under § 250.10; and (2) appellate counsel was ineffective for failing to argue that trial counsel was

ineffective for failing to call an expert to support petitioner's extreme emotional disturbance defense. As a threshold matter, respondent argues that petitioner's claim that trial counsel was ineffective for having failed to provide notice of a psychiatric defense is procedurally barred. The Court agrees.

It is well-established that a state inmate who seeks federal habeas review must first exhaust his available state court remedies. 28 U.S.C. § 2254(b)(1). This is so because "interests of comity and federalism dictate that state courts must have the first opportunity to decide a petitioner's claims." *Rhines v. Weber*, 544 U.S. 269, 273 (2005). "In order to satisfy the exhaustion requirement, a habeas petitioner must give the state courts a fair opportunity to review the federal claim and correct any alleged error." *Ortiz v. Heath*, 2011 WL 1331509, at *6 (E.D.N.Y. Apr. 6, 2011).

A claim may be deemed exhausted where further review is procedurally barred under state law. *See id.* ("[B]ecause the exhaustion requirement 'refers only to remedies still available at the time of the federal petition, it is [also deemed] satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law.'") (quoting *Coleman v. Netherland*, 518 U.S. 152, 161 (1996)). However, "[w]here a procedural bar gives rise to exhaustion . . . it also 'provides an independent and adequate state-law ground for the conviction and

sentence, and thus prevents federal habeas corpus review of the defaulted claim.'" *Id.* (quoting *Netherland*, 518 U.S. at 162). "For a procedurally defaulted claim to escape this fate, the petitioner must show cause for the default and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice, (*i.e.*, the petitioner is actually innocent).*" Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).

In this case, petitioner did not fully exhaust his claim that trial counsel ineffectively failed to file a notice of a psychiatric defense. While petitioner raised this claim in his pre-appeal motion to vacate the judgment, he did not seek leave to appeal the denial of that motion. On direct appeal, petitioner argued only that trial counsel was ineffective for having failed to object to the prosecutor's summation. Accordingly, petitioner has defaulted with respect to this claim. Moreover, petitioner also cannot return to state court to exhaust this claim, because he already raised it in his pre-appeal motion to vacate the judgment, and the time to appeal the denial of that motion has long since expired.

Because his claim is procedurally barred, petitioner can seek habeas review on this basis only if he can show either cause and prejudice, or that he is actually innocent. He cannot meet either of these standards.

With respect to cause and prejudice, petitioner has offered no explanation for having failed to exhaust this claim. Petitioner also cannot show prejudice, because his claim is without merit. First, and as the Monroe County Court found on petitioner's motion to vacate the judgment, petitioner filed a *pro se* § 250.10 notice dated August 7, 2007. Petitioner has not argued, nor does the record support the conclusion, that this *pro se* notice was treated as ineffective by the trial court. Accordingly, petitioner's claim must fail because notice of a psychiatric defense was in fact filed. Second, to the extent petitioner contends that trial counsel was ineffective for having not called a psychiatric expert, "[i]n general, whether or not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review." *Murden v. Artuz*, 253 F. Supp. 2d 376, 389 (E.D.N.Y. 2001). This is particularly true here, because under New York law, psychiatric testimony is not required to prove an extreme emotional disturbance defense. *See People v. Moye*, 66 N.Y.2d 887, 890 (1985). Moreover, petitioner has not provided any evidence that he ever received psychiatric or mental health-related treatment, nor has he identified any other evidence suggesting that an expert could have offered admissible testimony to support his defense. Accordingly, he cannot show that trial counsel's failure to retain or call a psychiatric expert amounted to ineffective assistance of counsel. *See Linnen v. Poole*, 766 F. Supp. 2d 427,

463 (W.D.N.Y. 2011) (denying ineffective assistance of counsel claim where counsel failed to call an expert to testify regarding an extreme emotional disturbance defense).

Petitioner also has not argued that he is actually innocent of killing Ms. Hammond, nor could he plausibly do so. As detailed above, an eyewitness observed him stabbing her in broad daylight. Moreover, petitioner has never denied stabbing Ms. Hammond, having argued only that his doing so was the result of extreme emotional disturbance. In short, petitioner cannot overcome the procedural bar, and is not entitled to federal habeas relief on this basis.

### 2.  Performance of Trial Counsel

Petitioner has also argued (and has exhausted the claim) that trial counsel was ineffective for having failed to object to the prosecutor's remarks in summation. Although petitioner does not identify the specific remarks he is referring to in his petition, on direct appeal he objected to the following statements by the prosecutor: (1) the statement that petitioner stabbed Ms. Hammond "in the vagina" and, by doing so, sent her the message that he owned her; (2) the statement that Ms. Hammond paid for petitioner's car; (3) the statement that petitioner did not tell Investigator Galetta that Ms. Hammond had left him for another man; (4) the statement that petitioner had been caught "red-handed"; (5) the statement that jury should hold petitioner accountable; (6) the prosecutor's alleged suggestion that petitioner had committed two

additional crimes (assault on Mr. Whisonant and trespass); and (7) the prosecutor's reading of petitioner's letters to Hammond to the jury.

As an initial matter, the record shows that trial counsel did in fact object to some of these statements. In particular, trial counsel objected to the prosecutor's statement that petitioner had stabbed Ms. Hammond "in the vagina" and to the prosecutor's statement that Ms. Hammond had paid for petitioner's car. It is axiomatic that trial counsel cannot be faulted for allegedly not making objections that he did in fact make.

Moreover, petitioner has failed to show that any of these comments were in fact objectionable. Under New York law, the "prosecution is afforded the widest latitude to comment on evidence." *People v. Abraham*, 22 N.Y.3d 140, 148 (2013) (internal quotation omitted). The prosecution is permitted to make "fair comment on the evidence and the reasonable inferences to be drawn therefrom," and to respond to defense counsel's summation. *People v. Hawley*, 112 A.D.3d 968, 969 (2d Dep't 2013).

The prosecutor's statement that petitioner had stabbed Ms. Hammond "in the vagina" to send a message that he owned her was a fair comment on the evidence at trial. Dr. LaPoint testified that Ms. Hammond had sustained a "sharp force wound" on the right side of her genitals. Petitioner's own letters from jail established that he felt he owned Ms. Hammond - indeed, in one such

letter he described her as his "most prized possession," and in another, he told her that if he could not be with her, no one else could.

With respect to the statement that Ms. Hammond had paid for petitioner's car, trial counsel objected to this statement and the objection was sustained. Moreover, the record clearly established that petitioner had no job or money and relied on Ms. Hammond to pay his rent and provide him with gas money. It was not unreasonable for the prosecutor to surmise that Ms. Hammond provided the money for petitioner's car.

The prosecutor was also permitted to draw the inference that petitioner had not told Investigator Galetta that Ms. Hammond had left him for another man. The written statement that petitioner reviewed and signed made no mention of petitioner having stated that Ms. Hammond was leaving him, but instead indicated that immediately prior to the stabbing, Ms. Hammond had refused to commit to meeting with petitioner. There was nothing improper about the prosecutor urging the jury to conclude that petitioner had changed his story over time.

Petitioner argues that the prosecutor's statement that he had been caught "red-handed" was impermissible because it suggested that the trial was a waste of time. However, the prosecutor's statement was factually accurate. An eyewitness saw petitioner stab Ms. Hammond in broad daylight and, when Sergeant Venosa

arrived, petitioner literally had blood dripping from his hand.  As respondent correctly argues, the prosecutor was not prohibited from accurately summarizing trial evidence simply because that evidence was particularly damning for petitioner.

With respect to the prosecutor's request that the jury hold petitioner accountable, petitioner contends that this request impermissible encouraged the jury to convict him based on public safety concerns.  However, a review of the record shows that this is not the case.  The prosecutor's argument was not that petitioner was a public safety risk, but was instead a direct response to defense counsel's suggestion that petitioner's circumstances had driven him to kill Ms. Hammond.  Indeed, the prosecutor specifically argued that petitioner had failed to hold himself accountable for his actions, and that it was up to the jury to do so.  This was not an impermissible "safe streets" argument, but an argument aimed squarely at the defense's theory of the case.

Turning to the prosecutor's discussion of petitioner's interaction with Mr. Whisonant, contrary to petitioner's contention, the prosecutor did not improperly suggest that petitioner was guilty of additional crimes.  Instead, the prosecutor accurately summarized Mr. Whisonant's testimony.  Moreover, defense counsel had raised the issue in his summation, arguing that Mr. Whisonant had thrown petitioner to the ground, thereby further damaging his psychological state.  It was

appropriate for the prosecutor to respond to that argument with a different characterization of the workplace encounter.

Finally, petitioner has argued that the prosecutor violated the best evidence rule by reading his letters to Ms. Hammond to the jury, and that counsel should have objected. Petitioner's argument misapprehends the application of the best evidence rule. The letters themselves were admitted into evidence, and the trial court properly instructed the jury that it could review them if it wished. The best evidence rule simply does not prohibit the reading of documents that have been admitted into evidence, and trial counsel cannot be faulted for not having made such an argument.

In sum, petitioner has failed to demonstrate that any of the prosecutor's summation remarks were objectionable. This Court therefore cannot find that trial counsel's failure to objection constituted deficient performance.

Moreover, petitioner also cannot demonstrate prejudice in any event. The evidence at trial of his guilt was overwhelming, as was the evidence that he acted not out of extreme emotional disturbance, but out of a longstanding desire to harm Ms. Hammond. As respondent correctly points out, trial counsel had the unenviable task of defending a client who had written a letter indicating that he intended to kill his wife and who had then in fact stabbed his wife to death in broad daylight, in the presence

of an eyewitness.  Under these circumstances, petitioner cannot show that the alleged errors made by trial counsel had any impact on the ultimate outcome at trial.

For the foregoing reasons, the Court finds that the Appellate Division's rejection of petitioner's ineffective assistance of trial counsel claim was neither contrary to nor an unreasonable application of established federal law.  Petitioner has therefore failed to establish his entitlement to habeas relief.

### 3.    Appellate Counsel's Performance

Petitioner also contends that appellate counsel was ineffective, because he did not argue that trial counsel was ineffective for having failed to file a § 250.10 notice.  This argument is easily disposed of.

As discussed above, petitioner has not shown that trial counsel's decision not to file a § 250.10 notice or to call a psychiatric expert at trial was deficient.  Appellate counsel cannot be found ineffective for having failed to make a non-meritorious ineffective assistance of trial counsel claim.  *See* *Ortiz*, 2011 WL 1331609, at *15 ("Given that an appellate attorney need not bring every potential non-frivolous claim in order to meet the *Strickland* performance prong, failure to raise a plainly meritless claim, as here, cannot be ineffective assistance of counsel.").  Moreover, the record shows that appellate counsel made a reasoned, well-supported evaluation of this claim and exercised

reasonable professional judgment in deciding not to pursue it on direct appeal. Accordingly, the Appellate Division's rejection of this claim was neither contrary to nor an unreasonable application of established federal law.

## IV. Conclusion

For the foregoing reasons, the amended petition (Docket No. 16) is denied and dismissed. No certificate of appealability shall issue because petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether th[is] . . . [C]ourt was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) and Fed. R. App. P. 24(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and therefore the Court denies leave to appeal as a poor person. *Coppedge v. United States*, 369 U.S. 438, 445-46 (1962). Any application for leave to appeal *in forma pauperis* must be made to the Second Circuit Court of Appeals in accordance with Fed. R. App. P. 24(a)(1), (4), & (5). The Clerk of the Court is instructed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          November 15, 2017